E-FILED
Monday, 21 March, 2022  10:19:29 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ELIZABETH ANN SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-3027 |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Elizabeth Ann Scott appeals from the denial of her application for Social Security Disability Insurance under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Scott filed a Brief in Support of Motion for Summary Judgment (d/e 11).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  Scott filed a Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e 17). The parties consented to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order</u>

entered May 24, 2021 (d/e 10).  For the reasons set forth below, the
Decision of the Commissioner is AFFIRMED.

## BACKGROUND

Scott was born on May 10, 1970 and completed high school.  She
applied for Disability Benefits on December 10, 2018, and previously
worked as an assembler, hotel housekeeper, and telemarketer.  She
alleged that she became disabled on May 23, 2016.  Scott suffered from
the severe impairments of obesity, venous reflux disease, degenerative
disc disease, and osteoarthritis of the right hip.  Scott previously applied for
Disability Benefits.  The prior application was denied on May 11, 2018.
Certified Transcript of Proceedings before the Social Security
Administration (d/e 8) (R.), at 15,18, 39-40, 42, 248.

## STATEMENT OF FACTS

### Evidence Submitted Before the Evidentiary Hearing

On July 23, 2013, x-rays of Scott's right hip showed mild sacroiliac
(SI) joint osteoarthritis.

On August 3, 2015, an MRI of Scott's lumbar spine showed minimal
degenerative disc disease at L3-L4 with a slight generalized bulge with no
central canal narrowing and minimal foraminal narrowing; and moderate

facet arthropathy and slight anterolisthesis at L4-L5 with a mild disc bulge and moderate bilateral neuroforaminal narrowing.  R. 460.

On March 11, 2016, Scott saw Dr. Daniel Child, D.O. for back pain. Scott said that she had back pain for nine years since an automobile accident and had tried different treatments and medications.  Her current medications helped in the past but seem to be less effective now.  She had some numbness, tingling, and sharp pain going down from her lower back into her left leg down to the knee.  She reported no weakness.  R. 347.  On examination, Scott was five feet one and a half inches tall, weighed 233 pounds, and had a body mass index (BMI) of 43.31.  She was in no acute distress, reflexes were 2+ and symmetric, motor exam of all her extremities was normal, hamstrings and quadriceps were very tight, lumbar region was painful with light paraspinal muscles.  R. 349.  Dr. Child administered some osteopathic manipulative therapy (OMT).  Scott tolerated the therapy and showed mild improvement.  R. 347.

On March 16, 2016, Scott saw Dr. Areej Javaid, M.D.  She reported back pain when sitting or standing that radiated into her left lower extremity. She rated the pain at 10/10 and also reported numbness in her left thigh and intermittently in her right thigh.  R. 344.  On examination, Scott's lower spine was tender to palpation, she was unable to feel light touch on her

anterior and lateral left thigh, and her left medial thigh felt sore. Dr. Javaid adjusted her medications. R. 344,346.

On August 21, 2017, a thoracic spine x-ray showed thoracic disc degeneration and no compression fracture or malalignment. R. 634.

On September 26, 2017, Scott saw Dr. Michael Nellestein, M.D., for venous insufficiency. She had swelling in both legs for over a year, a blistering rash on her lower legs, and aching and heaviness in both legs. R. 512. On physical examination, Scott had a few spider veins on her legs, but no reticular veins or varicose veins, some erythematous areas on the anterior of both legs, and 1+ pretibial edema bilaterally. An ultrasound showed significant venous reflux disease in the greater saphenous veins and their tributaries. Dr. Nellestein recommended laser ablation of the greater saphenous veins in both legs and ultrasound guided sclerotherapy on the right. R. 513-14. Scott agreed to the treatment plan.

Dr. Nellestein preformed ablations on Scott's leg veins on November 20, 2017, November 28, 2017, December 4, 2017, December 14, 2017, and January 22, 2018 (Ablations). R. 489-91, 497-506.

On March 15, 2018, Scott saw Dr. Andrew Dunn, D.O. She reported chronic low back pain, a sinus infection, and was not sleeping well due to her back pain. R. 470. On examination, Scott was five feet one inch tall,

weighed 251 pounds, and had a body mass index (BMI) of 47.43.  R. 473.

Her sinuses were tender to palpation, and she had a serious middle ear

effusion in both ears and bilateral 2+ pretibial pitting edema.  She had no

clubbing of the fingers and no peripheral cyanosis.  A salmon-colored

macular rash on the anterior of both lower extremities was healing and was

improved in appearance.  R. 471.  Dr. Dunn assessed an acute sinus

infection and chronic low back pain and prescribed antibiotics and a nasal

spray for the infections and gabapentin for the back pain.  R. 472.

On August 28, 2018, Scott saw Dr. Dunn complaining of right hip

pain. She only felt the pain when she was up and moving and rated the

pain at 10/10.  R.481.  On examination, Dr. Dunn noted sinus tenderness

on palpation and a serious middle ear effusion in both ears.  She had

bilateral 2+ pretibial pitting edema, but no clubbing of the fingers and no

peripheral cyanosis.  Dr. Dunn assessed right hip pain, renewed the nasal

spray prescription and the diazepam (Valium) prescription for pain, and

ordered x-rays of Scott's hip and pelvis.  R. 482.  The x-rays showed mild

osteoarthritis in the right hip joint with osteophytosis, and a cystic change at

the superolateral right humeral head near the head neck junction with

prominence of bone.  The finding could be seen with a CAM-type

impingement and clinical correlation was recommended.  No fracture was identified.  R. 636.

On September 14, 2018, an MRI of Scott's right hip showed mild right hip osteoarthritis with sub-centimeter subchondral cyst on the femoral head, a mild convex femoral head neck junction that put Scott at risk for CAM type femoroacetabular impingement, and a focal anterosuperior right hip labral tear.  R. 641.

On October 23, 2018, Scott saw neurosurgeon Dr. George Crickard, M.D. for right hip pain.  She said the pain was worse over the last three months and rated the pain at 5/10. The pain affected her sleep and medications did not help.  Injections in her hips under fluoroscopy helped briefly with the pain, but physical therapy made her pain worse.  R. 570. On examination, Scott had normal motor function, normal reflexes, and intact sensation in her upper and lower extremities.  Her right hip was tender to palpation, had no instability, had reduced range of motion, and minimal pain through motion.  Scott was able to stand and ambulate and her other extremities were normal, and she had no effusions on any of them.  R. 571.  Dr. Crickard also reviewed the August 2018 x-rays and the September 2018 MRI of Scott's right hip.  Dr. Crickard's impression was primary osteoarthritis of right hip and right hip pain and he believed the pain

came from both her back and her hip, but more from her hip.  Dr. Crickard

injected Kenalog into the joint space in her right hip under fluoroscopy.   R.

571.

On November 29, 2018, x-rays of Scott's lumbar spine showed

normal alignment with vertebral body heights maintained, multilevel

degenerative disc disease most severe at L4-5 and L5-S1 where she had

mild-to-moderate loss of disc height at L4-5 and mild loss of disc height at

L5-S1.  There was also moderate degenerative facet disease within the

lower lumbar spine and no definite pars defects.  R. 573.

On December 13, 2018, an MRI of Scott's lumbar spine showed a

mild posterior disc bulge with evidence of annular tear at L4-L5 and grade 1

anterolisthesis of L4 onL5 due to facet joint arthropathy.  R. 586.

On December 17, 2018, Scott completed a Function Report – Adult

form.  R. 266-73.  She had pain when she sat or stood for periods of time

and could not focus due to the pain in her lower extremities.  She had to

elevate her legs above her heart, so she lay in bed with her legs propped

up and spent much of the day in this position.  Sometimes she spent entire

days with her legs elevated and the pain in her legs also kept her up at

night.  As a result, she napped during the day.  The pain also made

bathing, dressing, and shaving difficult, and she had trouble getting up from the toilet due to the pain.  R. 266-67.

Scott said that she lived with her mother.  She prepared her own meals three times a week, but she took a long time to prepare meals because she performed preparation tasks "in little spurts."   She sometimes folded clothes, but otherwise did not do housework.  Her mother and son did the housework and Scott did not do any yardwork due to the pain.  She went outside three to four times a week and drove short distances and rode in cars.  She went shopping once a month and could pay bills, make change, and handle bank accounts.  The only other places she regularly went were doctors' offices.  R. 268-70.

Scott opined that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, and follow instructions.  She could walk half a block, after which she needed to rest 20 minutes to an hour.  She did not finish what she started, and her pain interfered with her ability to focus and follow instructions.  She got along well with authority figures and did not handle stress well, but she handled changes in routine "ok".  R.  271-72.

On January 3, 2019, state agency physician Dr. Vidya Madala, M.D., prepared a Physical Residual Functional Capacity Assessment for Scott.

Dr. Madala opined that Scott could occasionally lift 20 pounds; frequently

lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit

for six hours in an eight-hour workday; frequently pull or push with her

lower extremities, balance, kneel, crouch, crawl, stoop; and frequently

climb stairs, ramps, ladders, ropes, and scaffolds.  Dr. Madala also said

that Scott needed to avoid concentrated exposure to fumes, odors, dusts,

gases, and poor ventilation.  R. 71-73.

R. 71-73.

On February 5, 2019, Scott saw Dr. Dunn for chronic pain.  She

reported an allergic reaction to diazepam and stopped taking it and asked

for something else for her pain.  Scott weighed 255 pounds and had a BMI

of 50 at the office visit.  On examination, she had sinus tenderness to

palpation and serious middle ear effusions in both ears, bilateral 2+

pretibial pitting edema, no clubbing of her fingers, and no peripheral

cyanosis.  Dr. Dunn prescribed an antibiotic for the sinus infection and

methocarbamol (Robaxin) for pain.

On March 18, 2019, Scott saw nurse practitioner Jordan Hogan, NP,

working with pain specialist Dr. Howard Dedes, M.D.  R. 714-18.  Scott had

low back pain that radiated to her right hip with numbness and tingling in

her lower extremities.  She had epidural injections that provided temporary

relief; the last injection from Dr. Crickard only provided relief for two weeks. She rated her pain at 5/10 and said it was continuous, had become worse over time, and was worse in the afternoon and evening.  The pain was worse with standing, walking, movement, and bending forward, and the pain was made better with lying down.  The pain also caused problems with her sleep but did not result in weakness.  R. 714-15.  On examination, Scott had a normal gait, 5/5 strength, no atrophy, normal range of motion, and tenderness in the bilateral paralumbar and sacroiliac.  Straight leg raising testing was mildly positive, Fabere's test was positive, the thigh thrust test was positive, and SI joint compression test was positive.[1]  R. 715.  Hogan assessed sacroiliitis, lumbar radiculopathy, and an underlying facet syndrome and recommended a SI joint epidural injection, a home exercise program, weight loss, heat, ice and other "conservative modalities."  Hogan also asked Scott to consider physical therapy.  R. 716. On March 21, 2018, Dr. Dedes administered the SI joint epidural injection. R. 721-23, 728.  Scott rated her pain at 0/10 after the injection.  R. 730.

---

[1] Straight leg raising is a test for lumbosacral nerve root irritation.  Straight Leg Raise Test - StatPearls - NCBI Bookshelf (nih.gov), visited March 15, 2022.  The FABERE/Patrick test is a maneuver of the hips and legs while supine to determine the presence or absence of sacroiliac disease.  Stedman's Medical Dictionary, 907150 "Patrick test," available on Westlaw Edge database, viewed February 2, 2022.  The thigh thrust test and SI joint compression tests are tests used to help predict how a person would respond to pain relieving injections in the sacroiliac joint.  Validity of Physical Exam Maneuvers in the Diagnosis of Sacroiliac Joint Pathology - PubMed (nih.gov), visited March 15, 2022.

On March 19, 2019, Scott completed a Physical Impairments Questionnaire.  She reported she could not use kitchen utensils because she could not stand for long periods.  She had weakness in her hands, but could dial a phone, pick up a coin, or use a pen or pencil.  She could not lift or reach overhead due to low back pain.  She could sit for 20 minutes before she had to lie down, and could only sit once a day.  She had to lie down to rest after preparing or eating meals.  R.301-02.

On June 12, 2019, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment of Scott and concurred with Dr. Madala's January 3, 2019, assessment.  R. 96-98.

On May 20, 2019, Scott saw nurse practitioner Hogan.  She rated her back pain at 5/10 and said it radiated into her hips and down her left leg into her thigh.  She said the SI joint injection improved her pain 20 percent for about a week.  R. 731.  On examination, Scott had adequate and functional active range of motion in her extremities, a normal gait, and her lower extremities had functional strength.  Her back had normal range of motion with tenderness in her paralumbar and sacroiliac area.  Her straight leg raising tests were mildly abnormal; her Fabere's test was positive, her thigh thrust test was positive, and her SI joint compression test was

positive.  R. 732.  Hogan assessed sacroiliitis, lumbar radiculopathy, and underlying facet syndrome and recommended continued home exercise program, weight loss, heat, ice, and "conservative modalities."  Hogan also recommended lumbar transforaminal epidural steroid injections.  R. 733-34.

On May 30, 2019, Scott saw Dr. Dunn to discuss gastric surgery.  On examination, Scott had sinus tenderness on palpation, serious middle ear effusion in both ears, bilateral 2+ pretibial pitting edema, no clubbing of the fingers, and no peripheral cyanosis.  Dr. Dunn assessed morbid obesity and lumbar spondylosis.  R. 652.

On June 5, 2019, Scott saw state agency physician Dr. Vittal Chapa, M.D., for a consultative physical examination.  R. 605-11.  Scott said that she had a motorcycle accident in 2006 and has had back pain ever since. She had pain every day, could not stand or sit for long periods, could not walk long distances, and lay down to get pain relief.  Cleaning house was extremely difficult.  On examination, Scott was 62 inches tall, weighed 253 pounds, and walked with a limp, favoring her right hip.  She had no redness, heat, swelling, or thickening of any joints; no motor weakness; no edema in her lower extremities; and full range of motion in all her joints except the right hip, which had slightly limited range of motion.  She had 5/5 grip strength and could perform both fine and gross manipulations with

both hands.  Scott's range of motion of the lumbar spine was limited and straight leg raising testing was negative and her sensory exam was normal. Dr. Chapa assessed chronic lumbosacral pain syndrome.  R. 606-07.

On July 8, 2019, Scott saw nurse practitioner Hogan and rated her pain at 6/10.  The lumbar transforaminal epidural steroid injection provided no relief.  On examination, Scott had adequate and functional active range of motion of her extremities, her gait was normal, her strength was functional in her lower extremities, her range of motion in her back was normal, and she had tenderness in her paralumbar and sacroiliac areas. Her straight leg raising tests were mildly positive, Fabere's test was positive, thigh thrust was positive, and SI joint compression test was positive.  Hogan recommended continuing her home exercise program, losing weight, applying heat and ice, and using other conservative measures.  Hogan also recommended physical therapy, but Scott refused. At Scott's request, Hogan referred her to a neurosurgeon for a second opinion of possible surgical options.  Another surgeon had already concluded that Scott's condition would not benefit from surgery.   R. 763-65.

On July 11, 2019, Scott saw advanced practice nurse Jennifer Holcomb, APRN, CNP/FNP, for a consultation on possible bariatric

surgery.  Scott weighed 250 pounds 5 ounces, had a BMI of 45.78, and was 140 pounds over her ideal weight.  She reported that she could perform her activities of daily living without limitations but could not work and could not do housework without limitations.  R. 678-79.  On examination, Scott was in no acute distress, and had a normal gait.  R. 680.  Holcomb assessed morbid obesity and explained the requirements for the surgery to Scott.  R. 680-81.

On July 30, 2019, Scott saw Dr. Anthony L. Biggs, D.O., for right hip pain.  Two weeks earlier, her right hip popped out of place and she has had back pain for 14 years.  On examination, Scott had normal range of motion and strength in her left hip, and tenderness, decreased range of motion, and 4/5 strength in her right hip.  Dr. Biggs reviewed the September 4, 2018, MRI of Scott's right hip.  Dr. Biggs assessed chronic hip pain and prescribed tramadol and over the counter Tylenol and referred Scott to Dr. Crickard.  R. 771-74.

On August 1, 2019, Scott saw Dr. Crickard.  She reported 9/10 pain with activity with her right hip, and hip pain at night.  On examination, Scott's BMI was 44.46.  She had normal motor function, reflexes, and sensation in her extremities, pain in her right hip with internal and external rotation, reduced range of rotation of the right hip, and straight leg raising

tests were negative.  Otherwise, her extremities had normal strength and
range of motions with no defects, tenderness, masses, or effusions.   Dr.
Crickard assessed primary osteoarthritis of the right hip.  Scott wanted a
hip replacement, but Dr. Crickard wanted her to undergo physical therapy
before any surgery.  R. 779-81.

On August 27, 2019, Scott saw Dr. Dunn.  She reported being
scheduled for surgery on her right hip in a few months and wanted to stop
smoking.  R. 659.  On examination, she had sinus tenderness to palpation,
serious middle ear effusions in both ears, bilateral 2+pretibial pitting
edema, no clubbing of the fingers, and no peripheral cyanosis.  Dr. Dunn
also found a maculopapular rash on the erythematous border and
excoriated it.  Dr. Dunn assessed osteoarthritis of the hip and nicotine
dependence and prescribed bupropion (Wellbutrin) for smoking cessation
and meloxicam for her hip.  R. 661.

On August 28, 2019, Scott saw Dr. Abby Reich, M.D. for weight loss.
She needed to lose a significant amount of weight for hip replacement
surgery and reported that gabapentin and Lyrica helped with her pain.  On
examination, her upper and lower extremities were normal.  Dr. Reich
assessed morbid obesity and recommended a 1,200-calorie diet and
downloading a "Lose-it" app on her phone to record her entire dietary

intake.  Dr. Reich told Scott to eat regular meals; avoid snacks; drink water, low fat milk, coffee, or tea, and avoid sodas, fruit juices, and sweetened tea as much as possible.  She gave Scott advice on meal portions and nutrition and on how to increase her physical activity gradually.  R. 682-85.

On August 15, 2019, Scott saw registered dietician Angela Zanger-Geiselman, RD.   Dr. Crickard wanted her to lose weight and stop smoking before scheduling her hip surgery.  Scott said that she did the grocery shopping and, with her mother, did the cooking.  She drank sweet tea and soda during the day, but had cut down to one soda a day.  Her mother fried meat when she cooked.  Scott had no exercise program, but Dr. Crickard had given exercises to strengthen her hip and recommended that she start riding a bicycle.   R. 784.

On October 9, 2019, Scott saw Dr. Reich.  She weighed 247 pounds, had a BMI of 45.18, and had lost five ounces since August 28, 2019.  Scott's goal was to get her BMI under 40 so she could have hip surgery and she wanted to come off gabapentin.  She had taken topiramate (Topamax) in the past and it helped with sugar cravings.  She downloaded the Lose-It app, but did not use it, and cut down on, but did not eliminate, drinking soda and sweetened tea.  R. 687.  On examination, she had no peripheral edema or cyanosis.  Dr. Reich assessed morbid obesity and

offered counseling, but Scott declined.  Dr. Reich recommended weaning off gabapentin and prescribed phentermine and Topamax.  Scott had previously taken Topamax and said it helped with cravings for sugar.  R. 686-89.

On October 23, 2019, Scott saw Dr. Dunn for a follow up on her weight loss and because of a skin tag on her outer right eye.  She could not afford her weight loss medication because her insurance would not pay for it.  On examination, she had sinus tenderness on palpation, serious middle ear effusion in both ears, bilateral 2+ pretibial pitting edema, no clubbing of the fingers, and no peripheral cyanosis.  Dr. Dunn assessed right hip pain, morbid obesity, and a skin tag.  He removed the skin tag and continued her medications.  R. 663-66.

On November 6, 2019, Scott saw dietician Zanger-Geiselman.  She weighed 245 pounds and did not start recommended exercises, but she started walking; however, she could only walk for five minutes at a time due to back pain.  She was doing more of the cooking, and so, was not frying as much food.  R. 793-94.

On November 13, 2019, Scott saw Dr. Reich.  She weighed 243 pounds 7 ounces and her BMI was 44.53.  She was still drinking sugary beverages and not tracking her calorie intake.  She did not take the

phentermine because of the price, but said that she would start taking the medication because she had a coupon that would reduce the price to $11 a month.  On examination, she had no peripheral edema or cyanosis, and had normal motor exams of her extremities.  Dr. Reich assessed morbid obesity and stated that Scott had to track her food intake and would continue taking Topamax and would begin taking phentermine.  R. 690-93.

On November 20, 2019, Scott saw Hogan.  Hogan had attempted to refer Scott for a second opinion, and she was told that Scott needed to have her BMI at 30 or below to be seen.  Scott said she had lost 20 pounds.  On examination, she had a normal gait, adequate and functional active range of motion in her extremities, functional strength in her lower extremities, normal range of motion in her back, and tenderness in her paralumbar and sacroiliac regions.  Her straight leg raising tests were mildly positive, Fabere's test was positive, thigh thrust test was positive, and SI joint compression test was positive.  Hogan again recommended physical therapy and Scott again declined.  R. 797-800.

On January 15, 2020, Scott saw Dr. Reich.  She weighed 243 pounds and ate whatever she wanted over the holidays.  She started cutting back after the holidays, but was not keeping track of what she ate, and was still drinking soda.  She was taking topiramate, but could not afford the

phentermine.  On examination, Scott had no peripheral edema, and upper and lower extremities had normal strength.  R. 694-96, 697.

On February 12, 2020, Scott saw Dr. Reich.  She weighed 245 pounds with a BMI of 44.83.  On examination, she had no peripheral edema and normal motor exams of her extremities.  R. 797-99.

On February 13, 2020, Scott saw dietician Zanger-Geiselman.  She continued to live with her mother but did more of the cooking.  She put bariatric surgery on hold because she could not afford the shakes and other supplements she needed to purchase after surgery.  She did not meet her goal to increase her walking.  R. 808.

On April 1, 2020, Scott saw Dr. Reich.  She reported she weighed 243 pounds at home two days before the appointment, but continued to drink sugary sodas.  Dr. Reich reiterated that she needed to stay on a 1,200-calorie diet, keep track of her food intake, and stop drinking soda and sweetened tea.  R. 701-02.

### The Evidentiary Hearing

On May 11, 2020, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 31-65.  Scott appeared with her attorney. Vocational expert Stella Frank also appeared.  R. 34.

Scott testified that she last worked in 2016 as a housekeeper in a hotel and previously worked as a telemarketer selling insurance and as a gluer in a factory.  R. 40-41.  Scott weighed 246 pounds at the hearing and her weight was up 50 pounds in the last four years.  She gained the additional weight due to inactivity.  R. 42-43.  She quit the housekeeping job because of problems with her legs which swelled every day.  Before Dr. Nellestein performed Ablations on her legs in late 2017 and early 2018, Scott tried wearing compression stockings and elevating her legs every day.  She also had ulcers on her legs.    R. 45-46.

The Ablations improved the majority of the swelling she experienced, but she still had swelling in the middle of her shin down to her feet every day.  The Ablations got rid of the ulcers on her legs.  R. 46.  After the Ablations, she did not take any medications for her legs.  R. 46-47.  After the Ablations, Scott still elevated her legs every day for the entire day other than to use the bathroom or to get something to eat.  Sitting in a straight back chair aggravated the swelling in her legs.  R. 47.  She still had numbness and limited circulation in her legs after the Ablations.  R. 51-52.

Scott also had problems with pain in her back every day that radiated down into her lower extremities, worse on the right.  She had various injections for her pain, but the injections did not help.  Scott testified that

her surgeon told her that she had to lose weight before he could perform a hip replacement surgery on her.  R. 47-49.

Scott tried to lose weight, but dieting was hard, and she did not have control over what she ate because her mother and son did the cooking. She also considered bariatric surgery, but she could not afford the special foods and supplements she would need to eat after the surgery.  R. 49-50, 53.

Scott said that, due to her back and hip pain, she could only stand for 10 minutes, walk a quarter of a block, or sit for 10 to 15 minutes.   She also had difficulty and pain bending, squatting, and stooping, and could lift five pounds.  No doctor put any restrictions on her ability to lift.  R. 56.  Scott was most comfortable lying down and spent eight hours during the daytime lying down.  R.55.  She used a heating pad three times a month when she was in "a lot of pain."  R. 50-51.  Scott said that no healthcare providers recommended physical therapy in the last 10 years.  R. 57.

Vocational expert Frank testified.  The ALJ asked Frank the following hypothetical question:

> Assume a person of the claimant's age, education and work experience who is able to perform light work, never climb ladders, ropes or scaffolds, occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, avoid concentrated exposure to excessive vibration, pulmonary irritants, extremes of heat and cold, avoid all exposure to

unprotected heights, as well as operational control of moving machinery. Would such a person be able to perform any of the claimant's past work?

R. 59.  Frank opined that such a person could performed Scott's past relevant work as a housekeeper, telemarketer, and gluer.  The ALJ asked Frank to assume that the person had the additional limitations that she could never kneel, crouch, or crawl.  Frank opined that such a person could perform the telemarketer and gluer jobs as generally performed in the national economy.  R. 59-60.  Finally, the ALJ asked Frank to assume the additional limitation that the person was limited to sedentary work rather than light work.  Frank opined that such a person could perform Scott's past relevant work as a telemarketer.  R. 59-60.

Frank opined that to maintain employment, employees may not have more than one unscheduled absence from work per month.  Aside from scheduled breaks and mealtimes, employees also must be productive 85 percent of the worktime.  A person performing sedentary work could elevate her feet up to 12 inches while working.  If the person needed to elevate her legs above her waist, she could not work.  She could not work if she needed to lie down during worktime, other than during scheduled breaks and mealtimes.  R. 60-63.  The hearing concluded.

## THE DECISION OF THE ALJ

On June 11, 2020, the ALJ issued his decision.  R. 15-25.  The ALJ found that the Commissioner previously found that Scott was not disabled through May 11, 2018.  The ALJ said that Scott implicitly requested reopening the prior adverse ruling on her prior application of no disability through that date.  The ALJ denied the request because the record did not show a good reason to reopen. The ALJ, therefore, only considered whether Scott was disabled on May 12, 2018, and thereafter.  R. 15.

The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Scott met her burden at Steps 1 and 2.  She had not worked since May 12, 2018, and she suffered from the severe impairments of obesity, venous reflux disease, degenerative disc disease, and osteoarthritis of the right hip.  R. 18.  The ALJ found at Step 3 that

Scott's impairments or combination of impairments did not meet or equal a

Listing.  R. 18.

> The ALJ then found that Scott had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl. She can occasionally climb ramps or stairs, balance, and stoop. She should avoid concentrated exposure to excessive vibration, pulmonary irritants, and extremes of heat and cold. She must avoid all exposure to unprotected heights and operational control of moving machinery.

R. 19.  The ALJ found that the medical evidence showed that Scott did not

have any issues related to venous insufficiency in her legs after the

Ablations in late 2017 and 2018, before the relevant date of May 12, 2018.

The ALJ questioned Dr. Dunn's medical office visit notes after May 12,

2018, that consistently noted pretibial edema:

> Treatment records noted bilateral 2+ edema, but it is worth noting that treatment records from [Dr. Dunn's office] generally showed unchanged information in each examination, including noting a serous middle ear effusion in each examination, raising questions as to whether the examination notes were updated to reflect accurate physical objective findings in each examination.

R. 21.  The ALJ further found that Dr. Crickard found that Scott's pain

would not be resolved with a hip replacement surgery because at least part

of the pain came from her back.  The ALJ noted examination notes from Dr.

Chapa and Reich that found no edema.  The ALJ further noted that no

medical record indicated that Scott received ongoing treatment for edema

after May 12, 2018. The ALJ also relied on imaging studies that showed

mild to moderate degenerative changes; examination notes that showed

normal range of motion except some limitation in her lumbar spine and right

hip, normal gait, and full strength; and no provider after May 12, 2018,

directed her to lie down or elevate her legs.  The ALJ concluded that the

evidence did not support finding limitations beyond the ones set forth in the

RFC.  R. 21.  The ALJ found Drs. Madala and Smith's opinions

unpersuasive because the other evidence supported a finding that Scott

could perform the limited range of sedentary work set forth in the RFC

rather than light work.  R. 23.  The ALJ further found that Scott did not

follow the instructions of Dr. Reich or her dietician to lose weight.  The ALJ

found Scott's testimony that she had no control over what she ate because

her mother did the shopping and cooking was not persuasive.  The ALJ

noted several occasions in the record in which Scott stated that she

participated in grocery shopping and cooking.  R. 24.  The ALJ found that

Scott's statements about the limiting effect of her symptoms was not

consistent with her other statements about her level of activity and not

consistent with the other evidence in the record.  R. 20, 24.

The ALJ found at Step 4 that Scott could perform her prior work as a telemarketer.  The ALJ relied on the RFC finding and the opinion of vocational expert Frank.  The ALJ concluded that Scott was not disabled. R. 24-25.

Scott appealed administratively.  The Appeals Council denied Scott's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Scott then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

In this case, the ALJ erred in his treatment of Dr. Dunn's treatment

notes after May 12, 2018, that consistently recited that Scott had 2+

pretibial edema.  The ALJ stated that Scott had no issues with venous

insufficiency since May 12, 2018, after the ablations.  R. 20.  The ALJ

acknowledged, however, that Dr. Dunn consistently noted 2+ pretibial

edema after that date.  The ALJ noted that the notes also consistently

noted a serious middle ear infection every time.  The ALJ stated that these

repetitions in the notes were "raising questions" about the accuracy of Dr.

Dunn's examination notes.  The ALJ, however, did not make a finding

about the credibility of Dr. Dunn's examination notes or the weight he gave

those notes.  If the ALJ is going to give no weight to several examination

notes from Scott's primary care physician, he needs to make an explicit

finding to that effect and provide a justification for that finding.  A vague statement that the repetitions were "raising questions" is not sufficient.

The error, however, is harmless in this case.  An error is harmless if correcting the error will not change the outcome.  See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (harmless error applies in judicial review of disability cases when a remand to correct the error would not affect the outcome of the case).  Here, the other medical evidence supported the conclusion that Scott did not have edema in her legs after May 12, 2018.  Scott and the ALJ cited no medical records in which Scott complained about swelling in her legs or edema after May 12, 2018.  Scott complained about back pain, hip pain, and pain and numbness that radiated from the back into the lower extremities.  Dr. Dunn's records after May 12, 2018, cited by Scott and the ALJ, repeated that same exact language about edema, but Dr. Dunn did not prescribe any treatments for edema.  Drs. Chapa and Reich found no edema in Scott's lower extremities in their examinations.  Dr. Crickard found no effusions or defects in Scott's lower extremities.  All this evidence would support the ALJ's conclusion that Scott had no issues related to venous insufficiency after the Ablations were completed in January 2018 and before the critical date of May 12, 2018.  If the matter was remanded because the ALJ did not make a specific finding

that Dr. Dunn's notes were erroneous, the ALJ would still make the finding

and the outcome would be the same.  As such, the error was harmless.

The decision otherwise was supported by substantial evidence.  The

evidence cited above provided substantial evidence to support the ALJ's

conclusion that Scott did not have a problem with venous insufficiency after

the Ablations, and so, after May 12, 2018.  The consistent examination

findings of normal strength, normal range of motion except for the right hip

and lumbar spine, normal gait; and the imaging studies that show mild to

moderate degenerative changes provided substantial evidence to support

the ALJ's finding that Scott could perform a limited range of sedentary

work.  The fact that Scott declined physical therapy also supported the

ALJ's conclusion that her condition was not as severe as she claimed.  See

SSR 16-3p, 2017 WL 5180304, at *8 ("[I]f the individual fails to follow

prescribed treatment that might improve symptoms, we may find the

alleged intensity and persistence of an individual's symptoms are

inconsistent with the overall evidence in the record").

The ALJ also cited substantial evidence to support his decision to

give little weight to Scott's statements about the severity of her symptoms.

The medical evidence did not indicate she was as severely disabled as she

claimed.  She testified that she spent most of her day lying down and did

not cook or shop, but she told several of her healthcare providers that she went grocery shopping and did some of the cooking. She also testified that she followed her dietician's instructions when she told her dietician and Dr. Reich that she did not. These inconsistencies in her testimony provided substantial evidence to support the ALJ's determination to give little weight to Scott's statements about her symptoms.

The opinions of Drs. Madala and Smith also provided substantial evidence to support the RFC finding. These were the only two opinions on physical residual functional capacity cited by the parties and the ALJ, and the ALJ found Scott's RFC to be more restricted than these doctors. The doctors opined that Scott could perform a limited range of light work, but the ALJ restricted Scott to a limited range of sedentary work. See e.g., Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (The fact that the ALJ found the claimant's RFC to be more limiting than agency physicians illustrated "reasoned consideration given to the evidence" by the ALJ.). All this evidence provided substantial evidence to support the ALJ's RFC finding. The RFC finding and the opinions of vocational expert Frank supported the conclusion at Step 4 that Scott could return to her past relevant work as a telemarketer. The ALJ's decision was supported by substantial evidence.

Scott challenges the ALJ's treatment of Dr. Dunn's examination notes.  As discussed above, the ALJ's error in the treatment of those notes was harmless.  Scott also argues that the RFC finding was not supported by substantial evidence.  As discussed above, the RFC finding was amply supported by the evidence.  Scott's arguments to the contrary are not persuasive.

Last, Scott argues that the ALJ should have reopened Scott's prior application for Disability Benefits and given her Disability Benefits for the period from the alleged Onset Date of May 23, 2016, until the Ablations were completed in 2018.  The Commissioner's decision not to reopen a disability claim is discretionary and is not subject to judicial review. Califano v. Sanders, 430 U.S. 99, 108-09 (1977); Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995); Alfreds v. Colvin, 618 F.Appx. 289, 290 (7th Cir. 2015).  As such, the Court lacks authority to review the ALJ's decision not to reopen Scott's prior application for Disability Benefits.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 16) is ALLOWED, Plaintiff Elizabeth Scott's Brief in Support of Motion for Summary Judgment (d/e 11) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED.

THIS CASE IS CLOSED.

ENTER:   March 18, 2022

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE